**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X
SECURITIES INVESTOR PROTECTION
CORPORATION,

                Plaintiff,

     v.

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

                Defendant.
-----------------------------------------------------------------X
In re:

BERNARD L. MADOFF,

                Debtor.
-----------------------------------------------------------------X
IRVING H. PICARD, Trustee for the
Liquidation of Bernard L. Madoff
Investment Securities LLC,


                Plaintiff,

     v.

ADELE FOX, individually and to the extent she
purports to represent a class of those similarly situated,
and SUSANNE STONE MARSHALL, individually
and to the extent she purports to represent a class of
those similarly situated,


                Defendants.
-----------------------------------------------------------------X

Adv. Pro. No. 08-01789 (BRL)

SIPA LIQUIDATION

(Substantively Consolidated)

Adv. Pro. No. 10-03114 (BRL)

APPEARANCES:

BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, NY 10111
Telephone:    (212) 589-4200
Facsimile:     (212) 589-4201
<u>By</u>:    David J. Sheehan
       Marc E. Hirschfield
       Deborah H. Renner
       Keith R. Murphy
       Seanna R. Brown

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff*

BECKER & POLIAKOFF LLP
45 Broadway
New York, New York 10006
Telephone:     (212) 599-3322
Facsimile:     (212) 557-0295
By:     Helen Davis Chaitman
          Peter W. Smith

*Attorneys for Adele Fox and Susanne Stone Marshall,
individually and a similarly situated class*

Before: Hon. Burton R. Lifland
             United States Bankruptcy Judge

## MEMORANDUM ORDER AND DECISION GRANTING TRUSTEE'S MOTION PURSUANT TO BANKRUPTCY CODE SECTIONS 362(a) AND 105(a) AND BANKRUPTCY RULE 7065 FOR ENFORCEMENT OF THE AUTOMATIC STAY AND FOR A PRELIMINARY INJUNCTION

Before the Court is the Order to Show Cause (the "Motion") of Irving H. Picard, Esq.

("Trustee"), trustee for the substantively consolidated Securities Investor Protection Act[1]

("SIPA") liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") and Bernard

L. Madoff ("Madoff"), seeking an order pursuant to, *inter alia*, sections 362(a) and 105(a) of the

Bankruptcy Code (the "Code") and Rule 7065 of the Federal Rules of Bankruptcy Procedure

("Bankruptcy Rules") (i) enforcing the automatic stay and declaring the actions (the "Florida

Actions," or the "Actions") brought by Adele Fox ("Fox") and Susanne Stone Marshall

("Marshall," and together with Fox, the "Florida Plaintiffs") against the estate of Jeffry M.

Picower and related entities (the "Picower Defendants") in the United States District Court for

the Southern District of Florida, West Palm Beach Division, Case Nos. 10-80252 and 10-80254

void *ab initio*; and (ii) enjoining the Florida Plaintiffs from litigating the Florida Actions, or any

---

[1] 15 U.S.C. §§ 78aaa *et seq.*  References to sections of SIPA hereinafter shall replace "15 U.S.C." with "SIPA."

other actions against the Picower Defendants, pending a final order of the Court approving the Trustee's settlement with the Picower Defendants.

For the reasons set forth below and at oral argument, the Motion is hereby GRANTED to the extent set forth herein.

## BACKGROUND[2]

### I. Procedural Background

As is well known, on December 11, 2008, Madoff was arrested by federal agents for perpetrating a multi-billion-dollar securities fraud scheme through his investment company, BLMIS. Madoff was charged with violations of SIPA sections 78j(b) and 78ff, and 17 C.F.R. section 240.10b-5 in the United States District Court for the Southern District of New York (the "District Court"). *United States v. Madoff*, No. 08-MJ-02735.[3] Also on December 11, 2008 (the "Filing Date"), the Securities and Exchange Commission (the "SEC") filed a civil complaint alleging, *inter alia*, that Madoff and BLMIS were operating a Ponzi scheme through BLMIS's investment advisor activities. This proceeding is ongoing before the District Court. *S.E.C. v. Madoff*, No. 08-CV-10791.

On December 15, 2008, the District Court granted the Securities Investor Protection Corporation's ("SIPC") application to place BLMIS customers under the protections of SIPA (the "Protective Order"). The Protective Order appointed Picard as trustee for the liquidation of the business of BLMIS and removed the SIPA liquidation proceeding to this Court pursuant to SIPA sections 78eee(b)(3) and (b)(4).

---

[2] Further background information is provided in *Secs. Investor Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC (In re Bernard L. Madoff Inv. Secs. LLC)*, 424 B.R. 122, 125–33 (Bankr. S.D.N.Y. 2010) (hereinafter "*SIPC v. BLMIS*").

[3] On March 10, 2009, this action was assigned to the Honorable Denny Chin in the United States District Court for the Southern District of New York, and was given a new docket number, No. 09-CR-213 (DC). On April 26, 2010, Judge Chin was inducted as a member of the Second Circuit Court of Appeals.

On March 12, 2009, Madoff pled guilty to an 11-count criminal indictment and admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]." *United States v. Madoff*, No. 09 CR 213 (DC), Plea Hr'g Tr., Docket No. 57, at p. 23. On June 29, 2009, Madoff was sentenced to 150 years in prison.

## II.    The SIPA Trustee's Authority and the Claims Administration Process

In addition to the powers granted by SIPA, the Trustee has the general powers of a bankruptcy trustee. *See* SIPA §§ 78fff-1(a), 78fff-1(b). He is charged with assessing claims, recovering and distributing customer property to BLMIS customers, and liquidating the assets of BLMIS for the benefit of the estate and its creditors.

On December 23, 2008, the Court entered an Order Approving Form and Manner of Publication and Mailing of Notices; Specifying Procedures For Filing, Determination, and Adjudication of Claims; and Providing Other Relief (the "Claims Procedure Order"), setting forth a systematic framework for the filing, determination and adjudication of claims in accordance with SIPA. Pursuant to the Claims Procedure Order, all customer claims are filed with the Trustee, who must determine the claims in writing. If the claimant does not object to the determination, it is deemed approved by the Court and binding on the claimant. If the claimant objects and files an opposition, the Trustee must obtain a hearing date and notify the claimant thereof. *See Peskin v. Picard (In re Bernard L. Madoff Inv. Secs. LLC)*, 413 B.R. 137 (Bankr. S.D.N.Y. 2009) (expounding generally on the claims administration process).

## III.   The Satisfaction of Customer Claims in a SIPA Liquidation

The statutory framework for the satisfaction of customer claims in a SIPA liquidation proceeding provides that customers share *pro rata* in customer property[4] to the extent of their net

---

[4] A fund of "customer property" consists of assets garnered by the SIPA trustee on account of customers. These assets are not ascribable to individual customers, but rather are distributed *pro rata* to the extent of a customer's net

equities, as defined in SIPA section 78*lll*(11) ("Net Equity").  *See* SIPA § 78fff-2(c)(1)(B).  If the fund of customer property is insufficient to make customers whole, the trustee is entitled to an advance from SIPC to pay each customer the amount by which his Net Equity exceeds his ratable share of customer property, subject to a cap of $500,000 for securities claims.  *See* SIPA § 78fff-3(a).

On March 1, 2010, after briefing and oral argument, the Court issued a decision (the "Net Equity Decision") approving the Trustee's method of calculating a customer's Net Equity as the amount of cash deposited into the customer's BLMIS account, less any amounts withdrawn from the customer's BLMIS account (the "Net Investment Method").  *See SIPC v. BLMIS*, 424 B.R. 122, 135, 140 (Bankr. S.D.N.Y. 2010).  The Court entered an order implementing its Net Equity Decision on March 8, 2010 (the "Net Equity Order").  The Net Equity Decision and Order, in accordance with SIPA and controlling Second Circuit precedent, upheld the Trustee's determination to allow claims in the amount of customers' net investments, denying claims of those customers whose withdrawals exceeded their initial investments and subsequent deposits. The Court's Net Equity Decision and Order held that *the fictitious profits listed on customers' last BLMIS account statements as of the Filing Date were not controlling for purposes of*

---

equity.  *See* SIPA § 78*lll*(4) (defining "customer property").  The question of whether funds transferred from BLMIS prepetition constitute "customer property" under SIPA section 78fff-2(c)(3) is a contested issue that was addressed by the parties and was one of the points considered at oral argument held on April 27, 2010.  However, for purposes of this Motion for a preliminary injunction, sufficient bases exist for granting the relief sought by the Trustee, as set forth herein, without coming to a determination on this question.  At this stage of the proceeding, the record overwhelmingly supports granting preliminary injunctive relief based on stay violations and the Florida Plaintiffs' intrusion into the delicate, near-complete settlement negotiations, which impact directly on this Court's jurisdiction over the BLMIS liquidation.  The separate issue concerning "customer property" will likely be determined in the context of a permanent injunction, or in consideration of a Bankruptcy Rule 9019 settlement proceeding, or within the context of other pending proceedings involving this same issue.

*determining customers' Net Equity claims.*  The Florida Plaintiffs are obviously disappointed at the economic impact on them from this Court's Net Equity decision.[5]

On March 16, 2010, the Court, on its own motion, joined by the requests of certain parties, certified its Net Equity Order for immediate appeal to the United States Court of Appeals for the Second Circuit pursuant to 28 U.S.C. section 158(d)(2).  *See SIPC v. BLMIS*, Adv. Pro. No. 08-01789 (BRL), Docket No. 2022.  Notices of appeal from the Court's Net Equity Order were filed by counsel for a number of customers, including counsel for the Florida Plaintiffs.[6]  *See id.* at Docket No. 2048.

### IV.  Participation of Marshall and Fox in the SIPA Liquidation of BLMIS

Both Marshall and Fox have filed customer claims in this SIPA liquidation pursuant to the Claims Procedure Order.  Marshall filed a claim with respect to one BLMIS account on January 14, 2009, claim number 000402.  *See* Sheehan Aff. in Supp. of Trustee's App. ("Sheehan Aff.") at ¶ 3, Ex. A.  Fox filed two claims for two separate BLMIS accounts on February 13, 2009, claim numbers 002269 and 002270.  *See id.* at ¶ 3, Ex. E.[7]

Marshall's claim was deemed allowed by the Trustee on July 24, 2009 in the amount of $30,000, the amount that Marshall deposited into the account, with no withdrawals.  *See id.* at ¶

---

[5] It is well recognized that at the judicially determined conclusion of every litigation there will inevitably be disappointed parties.  The Florida Plaintiffs fit squarely within this category.  Their counsel and members of their asserted putative class are participants in the pending appellate process in this circuit to challenge the Net Equity outcome.

[6] Florida Plaintiffs' counsel from Becker & Poliakoff LLP, Ms. Helen Davis Chaitman, filed briefs in opposition to the Trustee's calculation of Net Equity, and made an appearance and argued at the February 2, 2010 Net Equity hearing.  *See SIPC v. BLMIS*, Adv. Pro. No. 08-01789 (BRL), Tr. of Feb. 2, 2010 Net Equity Hr'g, Docket No. 1968, at pp. 109–119.  While neither Fox nor Marshall was specifically identified as Ms. Chaitman's client in the papers filed in connection with the Net Equity dispute, Ms. Chaitman referenced her representation of Fox during the hearing before the Bankruptcy Court on February 2, 2010.  *See id.* at p. 112 ("I have a client, who is the retired New York school teacher.  She is Adele Boxis [sic] (phonetic) and she is 86 years old.").

[7] The parties dispute the total number of accounts held by Fox.  The Trustee states that Fox filed claims for only two of seven BLMIS accounts "with which she is associated" and that these accounts are under investigation.  Trustee's Memo. of Law at p. 13; Sheehan Aff., Ex. E.  Fox states that she held only the two BLMIS accounts for which she filed claims. Fox Decl. at ¶ 3.

3, Ex. B. Marshall received a payment from the Trustee of funds advanced by SIPC against her Net Equity claim on August 21, 2009. *Id.* at Ex. D. Before receiving payment, Marshall executed an assignment and release of any claims against BLMIS or third parties for, *inter alia*, any illegal or fraudulent activity with respect to her BLMIS account that gave rise to her customer claim against BLMIS. *See id.* at Ex. C ("Marshall . . . in consideration of the payment of $30,000.00 to satisfy her claim for customer protection . . . does for herself hereby assign, transfer and set over to . . . Trustee . . . and SIPC . . . any and all rights, including causes of action or claims . . . against BLMIS and/or any third party arising out of . . . any fraudulent or illegal activity with respect to [her] BLMIS account . . . which gave rise to the allowed Customer Claim . . . ."). As of the Filing Date, Marshall's BLMIS account statement listed a balance of $202,836.91.[8] Marshall Decl. at ¶ 2.

Fox's claims have not yet been determined by the Trustee. According to the Florida Plaintiffs, the Trustee has determined that Fox has a negative net investment, having withdrawn more than she deposited from her BLMIS accounts, resulting in a Net Equity of zero dollars under SIPA and the Net Equity Decision. *See* Defs.' Mem. of Law at p. 4. As of the Filing Date, Fox's BLMIS account statements listed balances of approximately $887,420 and $1,948,718. *Id.*

## V. The Trustee's Pending Adversary Proceeding Against, and Settlement Negotiations with, the Picower Defendants

On May 12, 2009, the Trustee filed a complaint against the Picower Defendants alleging, *inter alia*, claims for fraudulent transfers, preferences, turnover, and state law fraudulent conveyances ("Trustee's Complaint"), seeking recovery of over five billion dollars, which litigation is ongoing before this Court. *See Picard v. Picower*, Adv. Pro. No. 09-1197 (BRL),

---

[8] The BLMIS account balances as of the Filing Date are pure market fictions arising from legerdemain practiced by Madoff as a form of market fantasy. *See SIPC v. BLMIS*, 424 B.R. 122 (Bankr. S.D.N.Y. 2010).

Docket No. 1. In connection with these claims, the Trustee has engaged in months of active settlement negotiations with the Picower Defendants and has obtained information through his investigation subsequent to the filing of his complaint. The Trustee indicates that he is on the verge of a settlement with the Picower Defendants that promises to achieve a substantial, multi-billion-dollar sum for distribution to Madoff victims. *See* Sheehan Aff. at ¶ 4; *Picard v. Fox*, Adv. Pro. No. 10-03114 (BRL), Tr. of Hr'g on the Mot., Docket No. 21, at pp. 14, 21–22.

### VI. The Florida Actions

Fox, individually and on behalf of a similarly situated class of BLMIS customers, filed a complaint on February 16, 2010, amended on March 15, 2010 (the "Fox Complaint"), in a putative class action against the Picower Defendants in the United States District Court for the Southern District of Florida, West Palm Beach Division (the "Florida District Court"). *See Fox v. Picower*, Case No. 10-CV-80252, Docket Nos. 1, 5. The Fox Complaint defines the purported class as "all persons or entities . . . who have not received the net account value scheduled in their BLMIS accounts as of the day before the . . . SIPA Liquidation." Fox Compl. at ¶ 74.

Similarly, Marshall, individually and on behalf of a similarly situated class of BLMIS customers, filed a complaint on February 17, 2010, amended March 15, 2010 (the "Marshall Complaint," and together with the Fox Complaint, the "Florida Complaints"), in a putative class action in the Florida District Court against the same defendants. *See Marshall v. Picower*, Case No. 10-CV-80254, Docket Nos. 1, 7. The Marshall Complaint defines the purported class as "all SIPA Payees, but only with respect to claims, or portions thereof, not assigned to the Trustee." Marshall Compl. at ¶ 74.

The Fox and Marshall Complaints are based on the same set of facts and causes of action. They assert claims against the Picower Defendants for, *inter alia*, conversion, unjust enrichment,

conspiracy, and violations of Florida's Racketeer Influenced and Corrupt Organizations Act ("RICO"), all arising from the Picower Defendants' alleged involvement in Madoff's Ponzi scheme. They assert injuries in the form of lost investment income and returns on their BLMIS investments, and tax payments made in connection with non-existent profits. The Fox Complaint asserts additional harm in the form of "exposure for monetary losses in connection with the Trustee's clawback efforts." Fox Compl. at ¶ 82. On the basis of their claims, the Florida Plaintiffs seek relief in the form of, *inter alia*, compensatory damages, prejudgment interest, an equitable accounting and the imposition of a constructive trust, disgorgement of ill gotten gains or restitution, treble damages, and punitive damages.

On March 24, 2010, Fox filed a motion for consolidation of the Fox and Marshall proceedings, as well as all related actions that might later be filed by other BLMIS account holders against one or more of the Picower Defendants. This motion is currently pending before the Florida District Court.

### VII. The Trustee's Complaint Against the Florida Plaintiffs

On March 31, 2010, the Trustee filed a complaint against the Florida Plaintiffs seeking a declaration that the Florida Actions violate the automatic stay under section 362(a) of the Code, a preliminary injunction pursuant to section 105(a) of the Code enjoining any further prosecution of the Florida Actions, and a temporary restraining order pending this Court's ruling on the Motion. On April 1, 2010, the Court entered an order to show cause temporarily restraining the Florida Plaintiffs from any further prosecution of the Florida Actions and scheduling a hearing on the Motion for April 19, 2010. The hearing on the Motion was subsequently adjourned, and the temporary restraining order extended, on consent of all parties to April 27, 2010.

**ARGUMENT**

**I.      The Florida Actions Violate the Automatic Stay Pursuant to Section 362(a) of the Code and at Least One Order of the District Court**

The commencement of a SIPA liquidation operates as an automatic stay of, *inter alia*, "the commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor," or "any act to obtain possession of . . . or to exercise control over property of the estate." 11 U.S.C. § 362(a)(1), (3); SIPA § 78fff(b) (applying chapter 3 of Title 11). Property of the estate, in turn, includes "all legal or equitable interests of the debtor in property as of the commencement of the case," 11 U.S.C. § 541(a)(1), "wherever located and by whomever held," 11 U.S.C. § 541(a), including causes of action possessed by the debtor at the time of filing. *In re Jackson*, 593 F.3d 171, 176 (2d Cir. 2010). The automatic stay is one of the most fundamental bankruptcy protections and applies broadly to "give[] the debtor a breathing spell" and to prevent creditors from "obtain[ing] payment of the[ir] claims in preference to and to the detriment of other creditors." H.R. Rep. No. 595, 95th Cong. 1st Sess. (1977); S. Rep. No. 989, 95th Cong. 2d Sess. 49 (1978), reprinted in 1978 U.S. Code Cong. & Admin. News 1978, pp. 5835, 5963, 6010, 6296–97. In this SIPA proceeding, the stay protects customers of BLMIS by fostering fair, uniform, and efficient distribution of customer property.

The Florida Plaintiffs violated the stay by usurping causes of action belonging to the estate under sections 362(a)(3) and 541 of the Code.[9] The Trustee has "exclusive standing" to assert causes of action belonging to the estate; "conversely, if the cause of action belongs solely to the . . . creditors, the trustee has no standing to assert it." *McHale v. Alvarez (In re The 1031*

---

[9] Despite the definition of the purported class, Marshall's execution of an assignment and release provides an additional basis for disputing her ownership of the claims stated in the Marshall Complaint. In fact, by assigning and transferring "any and all rights, including causes of action or claims . . . against BLMIS and/or any third party arising out of . . . any fraudulent or illegal activity with respect to [her] BLMIS account" to SIPC and Irving H. Picard, as Trustee of the BLMIS estate, Marshall may have effectively transferred any and all causes of action, which relate to her BLMIS account and gave rise to her customer claim, to the estate. Sheehan Aff., Ex. C.

*Tax Group, LLC*), 397 B.R. 670, 679 (Bankr. S.D.N.Y. 2008) (quoting *Goldin v. Primavera Familienstiftung, Tag Assocs., Ltd. (In re Granite Partners, L.P.)*, 194 B.R. 318, 324–25 (Bankr. S.D.N.Y. 1996)). The Second Circuit has held that "[i]f a claim is a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim, and the creditors are bound by the outcome of the trustee's action." *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 701 (2d Cir. 1989); *see also The 1031 Tax Group*, 397 B.R. at 679 ("To determine standing, the Court must look to the underlying wrongs as pleaded in the complaint and whether the plaintiff alleges a particularized injury."). In order to assert such a claim independently of the administration of the bankruptcy case, a creditor must have suffered an injury "significantly different" from the injuries to creditors in general. *In re Sage Enter., Inc.*, No. 04-B-05548, 2006 WL 1722582, at *15 (Bankr. N.D. Ill. Apr. 28, 2006) (quoting *Ashland Oil, Inc. v. Arnett*, 875 F.2d 1271, 1280 (7th Cir. 1989)) ("[W]here the creditors' injury, while having some personal elements, overlaps with injury suffered by other creditors . . . the question to be answered is whether the injury to the creditor is 'significantly different' from the injuries to other creditors in general.").[10] On the other hand, "if the cause of action does not explicitly or implicitly allege harm to the debtor, then the cause of action could not have been asserted by the debtor as of the commencement of the case, and thus is not property of the estate." *Schertz-Cibolo-Universal*

---

[10] The Florida Plaintiffs' argument that the Trustee lacks standing to represent their interests in the SIPA liquidation because Fox is not a creditor and Marshall is a "non-SIPA payee" is without merit. *See* Fl. Compls. at ¶ 4. As stated *supra* at Background, Section IV, both Florida Plaintiffs have filed customer claims in this liquidation; Marshall's claim was allowed by the Trustee in the amount of $30,000, and Fox's claims have not yet been determined by the Trustee. The Florida Plaintiffs are therefore customer claimants in the SIPA proceeding. *See* SIPA § 78*lll*(2) (defining a "customer" as including "any person who has deposited cash with the debtor for the purpose of purchasing securities"); SIPA § 78fff-2(c)(1)(b) (stating that customers share in customer property *pro rata* to the extent of their Net Equities). Additionally, as the Court has previously held, and as affirmed by the District Court, the mere "act of *entrusting* . . . cash to the debtor for the purpose of effecting securities transactions . . . triggers customer status" under SIPA. *Rosenman Family, LLC v. Picard (SIPC v. BLMIS)*, 401 B.R. 629, 635 (Bankr. S.D.N.Y. 2009) (quoting *In re ESM Gov. Secs., Inc.*, 812 F.2d 1374, 1376 (11th Cir.1987)), *aff'd*, 420 B.R. 108 (S.D.N.Y. 2009).

*City, Indep. Sch. Dist. v. Wright (In re Educators Group Health Trust)*, 25 F.3d 1281, 1284 (5th Cir. 1994) (citations omitted).   A trustee's exclusive ability to bring causes of action that generally affect all creditors fosters the goals of the automatic stay by promoting orderly resolution of claims and preventing single creditors from achieving preferential recoveries.

The Florida Plaintiffs are not seeking to redress a particularized injury or alleging harm caused directly to them by the Picower Defendants.[11]   In substance, the Florida Actions seek to redress the depletion of the BLMIS customer property fund, a harm that derivatively injures all customer claimants in the BLMIS liquidation.   In no way were the Florida Plaintiffs in privity with the Picower Defendants; rather, they were directly invested with BLMIS.   Nowhere do the Florida Plaintiffs contend that the Picower Defendants owed a separate duty, or caused a separate harm, particularly to them:  as admitted in the Florida Complaints, the "action arises from [the Picower] Defendants' participation in the now admitted massive Ponzi scheme" generally. Florida Compls. at ¶ 1.   The Florida Complaints allege that the Picower Defendants "knew or should have known that the funds used to pay [their] fictional profits could have only come from the accounts of *other BLMIS customers*," they "converted the cash in *other innocent BLMIS customer accounts* for their own personal benefit," and they "agreed with Madoff . . . to unlawfully divert and convert the cash of *other innocent BLMIS account holders, including Plaintiff and the class members*, for the[ir] benefit."   Florida Compls. at ¶¶ 9, 79 (emphasis added).   Whether sounding in bankruptcy, state law or common law, the claims asserted in the Florida Actions seek to redress a harm common to all BLMIS customer claimants and, consistent with the purposes of the automatic stay, belong exclusively to the Trustee.   Indeed, the Trustee's

---

[11] The Court is aware that the Fox Complaint seeks damages for "exposure for monetary losses in connection with the Trustee's clawback efforts," but fails to see how this so-called injury was caused by the Picower Defendants. Fox Compl. at ¶ 82.  Put charitably, this appears to be an example of a creative or "kitchen sink" pleading in an attempt to dubiously create an independent cause of action against the Picower Defendants.

pending adversary proceeding against the Picower Defendants alleges, *inter alia*, that they received fraudulent transfers from BLMIS that are recoverable for the benefit of all customers. *See* Trustee's Compl. at ¶ 5, *Picard v. Picower*, Adv. Proc. No. 09-01197 (BRL), May 12, 2009, at Docket No. 1. Thus, allowing the Florida Actions to proceed against the Picower Defendants for their own independent recoveries on these facts would effectively "convert the bankruptcy proceeding into a race to the courthouse," and "derail the bankruptcy proceedings."[12] *Fisher v. Apostolou*, 155 F.3d 876, 883 (7th Cir. 1998).

Relying on *Highland Capital Mgmt. LP v. Chesapeake Energy Corp.* (*In re Seven Seas Petroleum, Inc.*), 522 F.3d 575 (5th Cir. 2008), the Florida Plaintiffs argue unconvincingly that their claims are not property of the estate. In *Seven Seas*, investors purchased unsecured notes (the "Bondholders") issued by the debtor, purportedly relying upon certain estimates provided by Ryder Scott Co. (the "Ryder Report") in making such purchases. *Id.* at 578. Other investors, including Chesapeake Energy Corp. ("Chesapeake"), purchased senior secured notes that were also issued by the debtor prepetition. *Id.* at 578–79. During the case, the chapter 11 trustee brought an adversary proceeding against Chesapeake seeking, *inter alia*, re-characterization of its secured debt. *Id.* at 579. Following confirmation of the plan, the Bondholders sued Chesapeake and one of the debtor's officers in state court, alleging that they and the debtor

---

[12] With respect to the Florida Plaintiffs' Florida RICO claims, the Court's analysis under section 362(a)(3) is not inconsistent with the Second Circuit decision in *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096 (2d Cir. 1988). In *Bankers*, the plaintiff brought independent New York State RICO claims against officers of the corporate debtor, to whom the plaintiffs loaned $4 million. The court held that the claim was not property of the bankruptcy estate because it "d[id] not seek recovery for injuries suffered by [the debtor], but for injuries [the plaintiff] suffered directly." *Id.* at 1101. Unlike in *Bankers*, where the Plaintiff had a direct relationship with the defendants and acted in reliance upon misrepresentations made by the defendants, the Florida Plaintiffs, direct investors in BLMIS, lack any privity with the Picower Defendants. Indeed, but for the Picower Defendants' alleged depletion of BLMIS funds, the Florida Plaintiffs would not have suffered injuries. Accordingly, taken in combination with the Florida Plaintiffs' other claims, the RICO claims aggregate to nothing more than an attempt to end run the automatic stay and the Net Equity Decision of this Court that was perhaps unpalatable to the Florida Plaintiffs. *See generally*, *SIPC v. BLMIS*, 424 B.R. 122 (Bankr. S.D.N.Y. 2010). It should be noted that some courts have found creditors' fraud claims under RICO to be section 541 property, assertable only by the trustee. *See Koch Ref. v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1343 (7th Cir. 1987) (citing *Dana Molded Prods. Inc. v. Brodner*, 58 B.R. 576, 578 (N.D. Ill. 1986); *Warren v. Mfrs. Nat'l Bank of Detroit*, 759 F.2d 542, 545 (6th Cir. 1985)).

conspired to defraud the Bondholders by issuing secured notes to decrease the assets available to the Bondholders, and accomplished this fraud by using the misrepresentations in the Ryder Report to induce the Bondholders to purchase notes. *Id.* at 580–81. The Fifth Circuit held that the Bondholders' claims against Chesapeake were not property of the estate because the alleged injuries were not derivative of an injury to the debtor, and thus could not be asserted by the chapter 11 trustee. *Id.* at 584–87.

In relying on *Seven Seas,* the Florida Plaintiffs merely illustrate that it is possible for a bankruptcy estate and a creditor to own separate claims against third parties arising out of the same general conduct. However, such is not the case here. Unlike in *Seven Seas*, where Chesapeake allegedly made the misrepresentations "to induce the [B]ondholders to purchase" the notes, which they in reliance did, the Picower Defendants did not direct their actions at the Florida Plaintiffs. *Id.* at 586. Simply put, given that only the Bondholders relied upon the misrepresentations, the injuries they suffered as a result were distinct from those suffered by the debtor, as well as by other unsecured creditors. *Id.* at 587 n.7. Here, however, the injuries alleged, as well as the purported source of those injuries, are common to BLMIS and all BLMIS customers. Moreover, even if the Florida Plaintiffs' claims assert direct injuries, they would nonetheless be deemed property of the estate under *Seven Seas* because they seek to recover fraudulently transferred funds. *Id.* at 589 ("[S]ome claims that . . . may be said to 'belong to' the creditors . . . are nonetheless vested exclusively in the trustee . . . because they ultimately seek to recover assets of the estate that are not under the debtor's control-by reason of a fraudulent transfer . . . ."). Thus, *Seven Seas* does not support the Florida Plaintiffs' position.

Moreover, and in light of the foregoing analysis, the Florida Actions violate at least one stay order of the District Court in connection with the related, ongoing SEC litigation. All

parties herein received notice of, and are bound by, the District Court's order entered December 15, 2008 (the "December 15, 2008 Stay Order") declaring that "all persons and entities are stayed, enjoined and restrained from directly or indirectly . . . interfering with any assets or property owned, controlled or in the possession of [BLMIS]." *SEC v. Bernard L. Madoff*, 08-CIV-10791 (LLS), Docket No. 4, at ¶ IV (reinforcing the automatic stay); *see also* Order On Consent Imposing Preliminary Injunction Freezing Assets and Granting Other Relief Against Defendants, Dec. 18, 2008, Docket No. 8, at ¶ IX (the "December 18, 2008 Stay Order") ("no creditor or claimant against [BLMIS], or any person acting on behalf of such creditor or claimant, shall take any action to interfere with the control, possession, or management of the assets subject to the receivership."); Partial Judgment on Consent Imposing Permanent Injunction and Continuing Other Relief, Feb. 9, 2009, Docket No. 18, at ¶ IV (incorporating and making permanent the December 18, 2008 Stay Order) (the "February 9, 2009 Stay Order," and together with the December 15, 2008 and December 18, 2008 Stay Orders, the "District Court Stay Orders"). Accordingly, the Florida Actions not only violate the automatic stay, but also directly contravene at least the December 15, 2008 Stay Order.

Accordingly, as the claims asserted in the Florida Actions are property of the estate, and thus violative of the automatic stay, they are void *ab initio*. *FDIC v. Hirsch (In re Colonial Realty Co.)*, 980 F.2d 125, 137 (2d Cir. 1992) ("[A]ctions taken in violation of the stay are void and without effect.") (citing *48th St. Steakhouse, Inc. v. Rockefeller Group, Inc. (In re 48th St. Steakhouse, Inc.)*, 835 F.2d 427, 431 (2d Cir. 1987)); *accord Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 527 (2d Cir. 1994).

## II. The Florida Actions are Preliminarily Enjoined Pursuant to Section 105(a) of the Code

Section 105(a) of the Code permits the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provision of [the Code]." 11 U.S.C. § 105(a). Section 105 is not limitless, and thus "does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law." *Solow v. Kalikow (In re Kalikow)*, Nos. 08-5268-bk(L), 08-5274-bk (CON), 2010 WL 1407159, at *11 (2d Cir. Apr. 8, 2010) (internal quotations and citations omitted). However, bankruptcy courts are empowered to utilize their equitable powers under section 105 where appropriate "to facilitate the implementation of other Bankruptcy Code provisions." *Id.* (quoting *Bessette v. Avco Fin. Servs. Inc.*, 230 F.3d 439, 444 (1st Cir. 2000)).

### a. Threat to the BLMIS Estate Warrants Extension of Section 362(a) of the Code

To the extent section 362(a) and the District Court Stay Orders do not apply in their own right to stay the Florida Actions, the damaging effects of the Florida Actions on the estate warrant extending the stay pursuant to section 105(a) of the Code and well-settled Second Circuit precedent. While section 362(a)(1) of the Code typically stays "proceeding[s] against the debtor," courts have consistently utilized section 105 to extend section 362 to third-party actions against non-debtor entities "when a claim against the non-debtor will have an immediate adverse economic consequence for the debtor's estate." *Queenie, Ltd. v. NyGard Int'l*, 321 F.3d 282, 287 (2d Cir. 2003); *see also Nevada Power Co. v. Calpine Corp. (In re Calpine Corp.)*, 365 B.R. 401, 409 n.20 (S.D.N.Y. 2007) ("Courts consistently have found that section 105 may be used to stay actions against non-debtors even where section 362 otherwise would not provide such relief . . . ."); *Fisher v. Apostolou*, 155 F.3d 876, 882 (7th Cir. 1998) ("The jurisdiction of the

bankruptcy court to stay actions in other courts extends beyond claims by and against the debtor, to include suits . . . which may affect the amount of property in the bankrupt estate, or the allocation of property among creditors.") (internal quotations and citations omitted).

The Seventh Circuit's decision in *Fisher*, relying on Second Circuit precedent to uphold the bankruptcy court's extension of the automatic stay under section 105(a), is particularly instructive. *See Fisher*, 155 F.3d at 878 ("[F]ollowing, by and large, the reasoning of the Second Circuit in *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096 (2d Cir. 1988), we believe that the investors' claims . . . should be stayed pursuant to § 105 . . . ."). In *Fisher*, the chapter 7 debtors were Thomas W. Collins ("Collins") and Lake States, the corporation he used to run a fraudulent scam "similar to a Ponzi scheme." *Id.* at 877–78. During the bankruptcy, several creditor-investors (the "Apostolou Plaintiffs") asserted separate District Court fraud actions against Collins's non-debtor accomplices. The court found that, while not property of the estate, the Apostolou Plaintiffs' claims aimed at "the same limited pool of money, in the possession of the same defendants, as a result of the same acts, performed by the same individuals, [and] as part of the same conspiracy." *Id.* at 882. As a result, the court found that the fraud claims might "affect the amount of property in the bankrupt estate, or the allocation of property among creditors," and were thus properly stayed. *Id.* at 882. Accordingly, the court found, "the Apostolou Plaintiffs must wait their turn behind the trustee, who has the responsibility to recover assets for the estate on behalf of the creditors as a whole." *Id.* at 881.

As in *Fisher*, in light of the similarity between the Trustee's and the Florida Plaintiffs' claims, the Florida Actions will negatively affect assets of the estate and the allocation thereof to customers, justifying extension of the automatic stay. The Florida Plaintiffs' claims arise out of the same wrongs alleged in the Trustee's Complaint, committed by the same defendants, in

connection with the same Ponzi scheme. As admitted in the Florida Complaints, the "action arises from [the Picower] Defendants' participation in the now admitted massive Ponzi scheme." Florida Compls. at ¶ 1. Both the Trustee and Florida Plaintiffs target the same limited pool of funds originating with BLMIS: like the Trustee's pending fraudulent transfer claims, the Florida Actions seek BLMIS funds allegedly received and converted by the Picower Defendants "from the accounts of innocent Madoff and BLMIS customers." *Id.* The Florida Actions against the Picower Defendants thus threaten the Trustee's ability to collect on any judgment that may be awarded in connection with his pending adversary proceeding, to the detriment of the BLMIS estate. Finally, while the Trustee endeavors to have this pool of funds returned to the BLMIS estate for *pro rata* allocation among all Madoff victims, the Florida Actions seek to divert the funds for themselves and a discrete class of investors in direct contravention of the SIPA distribution scheme.

As indicated by the Trustee, the threat to the estate is particularly imminent given that the Trustee is "on the brink of a settlement" with the Picower Defendants that promises to achieve "significant dollars" for the BLMIS estate and all Madoff victims. Sheehan Aff. at ¶ 4. At oral argument, counsel for the Trustee made good faith representations, which are unchallenged, that these settlement negotiations "are extremely delicate . . . involving multiple parties and governmental agencies . . . very difficult, time-consuming and involving extraordinary sums of money."[13] *Picard v. Fox*, Adv. Pro. No. 10-03114 (BRL), Tr. of Hr'g on the Mot., Docket No. 21, at p. 15. Continuation of the Florida Actions against these same defendants therefore has the

---

[13]At oral argument, the parties intimated that the Trustee's negotiations with the Picower Defendants "involve[] more" than $2 billion, which amount is inaccurate and "not quite in the stadium" (in response to a "ball park" inquiry by the Court) of the greater potential settlement recovery for Madoff victims. *Picard v. Fox*, Adv. Pro. No. 10-03114 (BRL), Tr. of Hr'g on the Mot. Docket No. 21, at pp. 14, 21–22. Counsel for the Picower Defendants was present at the hearing on the Motion and supported the Trustee's description of the status of the negotiations and the enormity of the sums involved.

potential to further "reduce[] the Picower Defendants' motivations for entering into a settlement with the Trustee," "unravel months of investigation, litigation activity and settlement negotiations," and substantially undermine the Trustee's efforts to maximize recovery for the estate. Sheehan Aff. at ¶ 5. If the Florida Actions are permitted to go forward, "the Trustee[] will be hampered in [his] ability to pursue and ultimately settle fraudulent transfer claims" with the Picower Defendants, who will be "fearful of paying twice for the same transfer—once on the Trustee's claim and a second time on the derivative claim." *In re Dreier LLP*, Case No. 08-1505, Memorandum Decision signed on 4/28/2010 Denying Motions to Approve Settlements and Lift the Automatic Stay, Docket No. 520, at *32 (Bankr. S.D.N.Y. 2010) (publication forthcoming). Accordingly, under the facts presented, the Court finds that an extension of the stay is appropriate and necessary to preserve the integrity of the SIPA proceedings and the Trustee's settlement negotiations for the benefit of the BLMIS estate and all of its customer claimants.

> **b. Continuation of the Florida Actions Threatens the Court's Jurisdiction and Interferes with the Administration of the Case, Warranting an Injunction under Section 105(a)**

A substantial threat to this Court's jurisdiction likewise warrants the issuance of a preliminary injunction pursuant to section 105(a) of the Code. Because injunctions under section 105(a) are authorized by statute, they need not comply with traditional requirements of Rule 65.[14] *McHale v. Alvarez (In re The 1031 Tax Group, LLC)*, 397 B.R. 670, 684 (Bankr. S.D.N.Y.

---

[14] The traditional requirements for a preliminary injunction under Rule 65 are, however, also satisfied here. Under Rule 65, the moving party must show (1) that it will suffer irreparable harm in the absence of the relief requested; and (2) that there is either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, with a balance of the hardships tipping in favor of the moving party. *Random House, Inc. v. Rosetta Books LLC*, 283 F.3d 490, 491 (2d Cir. 2002). As demonstrated herein, there is a substantial "likelihood of success on the merits" of the Trustee's claims for relief on the bases that the Florida Actions violate the automatic stay and interfere with the administration of the estate. The Florida Actions threaten irreparable harm to the estate by interfering with the Trustee's settlement negotiations with the Picower Defendants, which have the potential to bring billions of dollars into the estate, and seeking recovery from the same limited pool

2008); *Eastern Air Lines, Inc. v. Rolleston (In re Ionosphere Clubs, Inc.)*, 111 B.R. 423, 431 (Bankr. S.D.N.Y. 1990); *Garrity v. Leffler (In re Neuman)*, 71 B.R. 567, 571 (S.D.N.Y. 1987). Rather, a bankruptcy court may utilize section 105 of the Code to "enjoin proceedings in other courts when it is satisfied that such a proceeding would defeat or impair its jurisdiction with respect to a case before it." *Johns-Manville Corp. v. Colorado Ins. Guar. Assoc. (In re Johns-Manville Corp.)*, 91 B.R. 225, 228 (Bankr. S.D.N.Y. 1988) (quoting *LTV Steel Co., Inc. v. Board of Ed. of the Cleveland City Sch. Dist. (In re Chateaugay Corp.)*, 93 B.R. 26, 29 (S.D.N.Y. 1988)); *see also Malm v. Goldin*, No. 92-Civ-8012 (LJF), 1993 WL 330489, at *2 (S.D.N.Y. Aug. 27, 1993); *Keene Corp. v. Coleman (In re Keene Corp.)*, 164 B.R. 844, 849 (Bankr. S.D.N.Y. 1994); *AP Indus., Inc. v. SN Phelps & Co. (In re AP Indus., Inc.)*, 117 B.R. 789, 802 (Bankr. S.D.N.Y. 1990).

As the Court presiding over the SIPA liquidation of BLMIS, this Court has sole jurisdiction over the administration and distribution of estate assets to customers. *Tennessee Student Assistance Corp. v. Hood*, 541 U.S. 440, 447 (2004) ("Bankruptcy courts have exclusive jurisdiction over a debtor's property, wherever located, and over the estate.") (citing 28 U.S.C. § 1334(e)); *see also* 78 U.S.C. § 78eee(b)(2)(A)(i), (4) ("Upon the filing of an application with a court for a protective decree . . . such court shall have exclusive jurisdiction of such debtor and its property wherever located . . . ."). While their causes of action may differ in name, the Florida Plaintiffs seek to recover the very funds sought by the Trustee through his avoidance actions. The Florida Actions thus have the potential to substantially undermine this Court's

---

targeted by the Trustee in his avoidance actions. Additionally, the Actions impair this Court's jurisdiction, as explained below. *See Calpine Corp. v. Nevada Power Co. (In re Calpine Corp.)*, 354 B.R. 45, 48 (Bankr. S.D.N.Y. 2006) (finding case law in this district has established a limited exception to the irreparable harm requirement where the action to be enjoined is one that would impair the court's jurisdiction). Last, the balance of harms tips decidedly in favor of enforcing the stay; if the Florida Actions are successful, the limited pool of funds that the Trustee seeks on behalf of customers will unjustly be redeemed by a finite number of BLMIS customers, to the detriment of all other deserving Madoff customers.

jurisdiction, as further prosecution could ultimately result in another court's determining how potential estate funds are distributed among certain BLMIS customers. This is particularly alarming given that any judgment awarded to the Florida Plaintiffs would exceed their entitlement to BLMIS distribution under SIPA and this Court's Net Equity Decision. *See SIPC v. BLMIS*, 424 B.R. 122, 135, 140 (Bankr. S.D.N.Y. 2010) (holding that customers' Net Equity claims, and thus their *pro rata* shares of customer property, are determined by reference to their net investments in BLMIS). Furthermore, as the Net Equity Decision has been certified for immediate appeal to the United States Court of Appeals for the Second Circuit, the Florida Actions are a disfavored form of litigation strategy that could result in multiple courts arriving at different and inconsistent rulings. *See AP Industries, Inc.*, 117 B.R. at 802 ("[T]he possibility of inconsistent judgments warrants the issuance of an injunction enjoining Defendants from further prosecution of the New York Actions."). Accordingly, the threat posed by the Florida Plaintiffs to this Court's jurisdiction provides additional grounds for preliminary injunctive relief under section 105(a) of the Code.[15]

## CONCLUSION

As set forth herein and at oral argument, the Florida Actions are directly violative of the extant stay and, specifically, the automatic stay under section 362(a) and at least one of the District Court Stay Orders and, as a result, are void *ab initio*. In addition, the Florida Plaintiffs are hereby preliminarily enjoined under section 105(a) of the Code from proceeding with the Florida Actions, or any related action against the Picower Defendants, pending a final order of

---

[15] This analysis is not at odds with the recent Second Circuit decision in *Solow v. Kalikow (In re Kalikow)*, Nos. 08-5268-bk(L), 08-5274-bk (CON), 2010 WL 1407159 (2d Cir. Apr. 8, 2010). There, the court held that section 105(a) did not provide an independent basis for imposing sanctions upon non-creditors for violating the section 524 discharge injunction. Unlike in *Kalikow*, the Florida Plaintiffs are creditors who filed customer claims in the case and are bound by section 362(a). Therefore, section 362(a) provides authority in the Code upon which this Court is authorized to utilize its equity power under section 105(a). Additionally, unlike in *Kalikow*, the Florida Actions are directed toward the estate and impact the administration of this case, as discussed above.

the Court regarding the Trustee's settlement with the Picower Defendants, or a final dispositive

order of this Court in *Picard v. Picower*, Adv. Pro. No. 09-1197 (BRL).

Dated: New York, New York
     May 3, 2010

                           /s/ Burton R. Lifland
                           United States Bankruptcy Judge